SELLS E. WOODHULL, Respondent, *v.* THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF NEW YORK and THE CITY OF BROOKLYN, Appellants.

*Municipal corporation — liability of, for the tortious acts of its police officers — not liable for negligence or want of skill — respondeat superior — trustees of Brooklyn bridge — power to designate peace officers — liability for their negligence.*

The police officers of a municipal corporation are not to be deemed its servants or agents in such a sense as to render it responsible for the damages occasioned to third persons by a failure on their part to duly and properly discharge the duties imposed upon them.

The rule of *respondeat superior* is based upon the rights which an employer has to select his servants and discharge them if not competent or skillful or well behaved, and to direct and control them while in his employ.

Where, by legislative enactment, a municipal corporation is required to elect or appoint an officer to perform a public duty laid, not upon it, but upon the officer, in which it has no private interest and from which it derives no special benefit or advantage, such officer is not a servant or agent of the municipality, and for his negligence or want of skill in the performance of his duty, or for that of a servant whom he employs, it is not liable.

Pursuant to section 8 of chapter 300 of the Laws of 1875, the trustees of the Brooklyn bridge, acting on behalf of the municipalities of New York and Brooklyn, have

an undoubted right to select persons as peace officers, upon whom is conferred the same authority as is enjoyed by policemen in either city; such persons, however, as they also act as guards or trainmen, and as their pay and employment are regulated by the bridge trustees, and as the municipalities receive remuneration from persons using the bridge, are in no sense agents or servants of the State, and are the agents and servants of such municipalities, for whose negligence and wrongful acts such municipalities are liable upon the doctrine of *respondeat superior.*

APPEALS by the defendants, The Mayor, Aldermen and Commonalty of the City of New York and The City of Brooklyn, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 12th day of December, 1892, upon the verdict of a jury for $4,000, reduced by an order of the court to $1,500 after a trial at the New York Circuit, and also from an order entered in said clerk's office on the 6th day of January, 1893, denying the defendants' motion to set aside the verdict and for a new trial made upon the minutes.

*Theodore Connoly,* for the appellants.

*Paul E. De Fero,* for the respondent.

O'BRIEN, J.:

It is conceded that at the time of the acts complained of the defendants owned and operated a railway across the New York and Brooklyn bridge, and were engaged in carrying passengers for hire on said railway. The action was for damages for the illegal arrest and false imprisonment of plaintiff under circumstances which may be briefly narrated.

On May 19, 1890, after plaintiff had paid his fare to be carried by the railway from the city of Brooklyn to the city of New York, and while in the act of entering one of the cars, a person, who was performing the ordinary duties of a guard, in closing the door of the car, shut it against and upon the leg of plaintiff; and as the result of the remonstrance by plaintiff against such treatment, he claims that he was, without warrant or cause, imprisoned and detained in the car and forcibly prevented from leaving it upon its arrival in the city of New York, and was brought back to Brooklyn and taken before one of the chief employees of the defendants about the bridge, charged with assault and battery, and thereafter

taken through the public streets of the city of Brooklyn to a police justice, and was there again charged with the assault and battery, and was detained and imprisoned in the prisoners' room or pen attached to the court room of the police justice and in the county jail of Kings county for several hours. Having given bail, he was some days afterwards tried and acquitted.

The defense of reasonable cause, upon conflicting evidence, was presented to the jury, and they reached the conclusion that the plaintiff was not guilty of assaulting the person who closed the door of the car upon his leg, and that his arrest was unjustifiable.

The answer, while admitting the allegations of arrest and detention, alleged that one of the police officers employed to patrol the bridge and to preserve order thereon, being a peace officer, did arrest the plaintiff for an assault and battery alleged to have been committed in his presence, and it denies that said arrest was made in the discharge of any duty owing by the officer to the defendants, and that it was made in the discharge of the officer's duty as a peace officer of the State of New York.

It is not our purpose to review the authorities which fully sustain the appellants' position, that if the person here causing the arrest was a peace officer of the State, the defendants would not be responsible for his tortious acts. We need but refer to the leading case of *McKay* v. *The City of Buffalo* (9 Hun, 401 ; affd. without opinion in 74 N. Y. 619), which is authority for the proposition that the police officers of a municipal corporation are not to be deemed its servants or agents in such a sense as to render it responsible for the damages occasioned by third persons by a failure on their part to duly and properly discharge the duties imposed upon them; and in the course of the opinion it is said : " Where it is sought to make a municipal corporation liable for the acts of its servants or agents, the cardinal inquiry is whether they are servants or agents of the corporation. If the corporation appoints or elects them, and can control them in the discharge of their duties, and continue or remove them, can hold them responsible for the manner in which they discharge their trust, and if those duties relate to the exercise of corporate powers, and are for the peculiar benefit of the corporation and its local and special interest, they may justly be regarded as its servants or agents, and the maxim of *respondeat*

*superior* applies.   But if, on the other hand, they are elected or appointed by the corporation in obedience to the statute to perform a public service, not peculiarly local or corporate, but because this mode of selection has been deemed expedient by the Legislature in the distribution of the powers of government, if they are independent of the corporation as to the tenure of their office and the manner of discharging their duties, they are not to be regarded as the servants or agents of the corporation for whose acts or negligence it is impliedly liable, but as public or State officers, with such powers and duties as the statute confers upon them, and the doctrine of *respondeat superior* is not applicable.   This is the doctrine laid down by Mr. Dillon.   (Dillon on Mun. Corp. § 772.)   In the next section of his work (§ 773) he says: ' Agreeably to the principles just mentioned, police officers appointed by a city are not its agents or servants so as to render it responsible for their unlawful or negligent acts in the discharge of their duties.' "   (See also 2 Dillon on Mun. Corp. [4th ed.] § 974.)

The law being thus settled, it would follow that, if the appellants' contention were correct, *i. e.*, that the person causing the arrest was in a strict sense a policeman, and as such an agent of the State, then no liability for his acts would fall upon the defendants. Whether a person possessed of the ordinary powers of a police or peace officer is the agent or servant of the State or of an individual or corporation, be it private or municipal, is not always easy to determine.

Without discussing cases relating to individuals or private corporations, we have for our guidance, as applicable to municipal corporations, a rule presented in the well-considered case of *Maximilian* v. *The Mayor* (62 N. Y. 163), which was a case in principle like this, wherein the liability is to be determined by the application of the rule of *respondeat superior*.   As therein said : " This rule of *respondeat superior* is based upon the right which the employer has to select his servants, to discharge them if not competent or skillful or well behaved, and to direct and control them while in his employ."   And in speaking with respect to municipal corporations of the test to be applied, the opinion continues : " There are two kinds of duties which are imposed upon a municipal corporation ;

one is of that kind which arises from the grant of a special power, in the exercise of which the municipality is as a legal individual; the other is of that kind which arises, or is implied, from the use of political rights under the general law, in the exercise of which it is as a sovereign. The former power is private and is used for private purposes; the latter is public and is used for public purposes." And as correctly stated in the head note, it was therein decided that, Where by legislative enactment a municipal corporation is required to elect or appoint an officer to perform a public duty laid, not upon it, but upon the officer, in which it has no private interest and from which it derives no special benefit or advantage, such officer is not a servant or agent of the municipality, and for his negligence or want of skill in the performance of his duty, or for that of a servant whom he employs, it is not liable.

With these principles to guide us, it remains to be determined upon the facts of this case whether or not the defendants were liable for what the jury has found to be their wrongful act in causing the plaintiff's arrest and imprisonment. It was shown on the part of the plaintiff that as he reached the train platform and proceeded to enter one of the cars by its side center door, he saw there a person in uniform, Bishop by name, stationed at the door and acting as a trainman or guard, performing the usual duties of a trainman or guard, assisting passengers in and out; that he had been frequently seen acting in the same capacity and performing the same duties. Upon his own examination, Bishop stated that in standing at the door and shutting it, he did so because the gong had struck, " and my orders were to shut the door when the gong struck." He further testified, however, that he had been a bridge policeman on the New York and Brooklyn bridge for nearly ten years, and that he was appointed a policeman by the trustees of the bridge. But with respect to his duties, in addition to what he had stated above as to obeying orders and shutting the door when the gong struck, he testified that his duties were to shut the door instantly upon the gong striking. It was further made to appear that the bridge trustees, representing the defendants, appointed two distinct classes of employees, whose dress was different, viz., guards and conductors wearing a cap with a peak on the top, and policemen who wear a helmet; that the former were appointed under section 7 of the act

of 1875, and the policemen under section 8 of the same act, which provides, among other things, that "policemen so appointed shall have and possess all the powers of policemen of the cities of New York and Brooklyn."

Although pursuant to the act the bridge trustees, acting on behalf of the two municipalities, have an undoubted right to select persons as peace officers, upon whom is conferred the same authority as policemen in either city, the question still remains whether they are servants or agents of the State, or the servants or agents of the municipalities.

When we remember that the bridge, though in one sense a public structure, has been erected as a private enterprise by the municipalities, which maintain thereon a railway for the carriage of passengers for hire, and that for such accommodations of carriage as they afford to persons or vehicles they are remunerated; and that each municipality has a direct and special benefit from the performance of such work; and that the structure itself is a local enterprise, in no way connected with the exercise of any political power granted by the State, or which it enjoys or exercises in common with other political divisions of the State, we do not think that it can be held that the persons selected by the municipalities as guards or trainmen, and who are engaged in discharging the duties devolving upon those who control the structure, whether they are called guards, trainmen or policemen, are in any sense the agents or servants of the State. When to these considerations are added the facts that the persons called bridge policemen, in addition to the power which they possess of preserving the peace, are engaged in discharging the ordinary duties devolving upon a trainman or guard, under orders, and that it appears that their selection, appointment, pay, removal, and their entire conduct in the discharge of their duties, are directly controlled and regulated by the trustees whom the municipalities have selected to manage on their behalf the affairs of the bridge, then we do not think there can be much hesitation when, in applying the rules, we reach the conclusion upon the facts here appearing, that the attendants on the bridge, by whatever name known, are the agents and servants of such municipalities, for whose negligence and wrongful acts they are liable upon the doctrine of *respondeat superior.*

In the case of *Walsh* v. *The Mayor* (107 N. Y. 220), in the course of the opinion (p. 224), it is said : " The bridge was to be completed and managed on behalf of the two cities jointly. * * * The trustees of the bridge were to be appointed by the city officials of the two cities. All the real estate purchased by the trustees was to belong to the two cities jointly, and the bridge and all its appurtenances, and all the property connected with it, was to belong absolutely to the two cities, in shares to each of the cities equal to the amount paid by them for the construction of the bridge and for the land and appurtenances thereof. All the revenues of the bridge were to belong to the two cities and were to be used for the payment of the indebtedness created by the cities for its construction. As the bridge is the property of the two cities, any revenue derived therefrom, after the payment of debts created for the construction thereof, would go into the treasuries of the two cities. So in every sense and in every view, the bridge was constructed and is managed for the two cities, and the trustees appointed by the city officials representing the two cities as their agents. Hence, they and the persons employed by them are the agents and servants of the cities, for whose careless and negligent acts they are liable."

This case would be a direct authority were it not for the distinction sought to be made from the circumstance that the person responsible for the arrest was appointed under the designation of a policeman, and possessed the ordinary powers of a policeman. This fact, it is insisted, is controlling as exempting the defendants from liability. We think it would be giving unusual force to the fact that the person committing the acts, because possessed of the powers of a peace officer, was thus created a State officer, although engaged in discharging a duty which devolved upon the defendants as common carriers of passengers in and about their cars.

The selection of the employees, pursuant to the authority of the Legislature, not for a public purpose, but for their private benefit and emolument, seems to place the cities with respect to their liability for the acts of those whom they select in the category of private corporations. When we consider, therefore, the relation which existed between the plaintiff and the defendants as common carriers for hire, and the obligations imposed upon them as such, which are clearly set forth in the case of *Dwinelle* v. *N. Y. C. & H. R. R.*

*R. Co.* (120 N. Y. 122), we think it follows that a failure to dis-
charge the obligations thus imposed upon defendants as common
carriers, due to the negligent or unlawful acts of those whom the
cities had selected to discharge such duties, creates a liability which
cannot be evaded by their either calling such servants policemen or
conferring upon them the powers which are ordinarily possessed by
police officers, because if liability could thus be evaded all that
would be necessary for the trustees to do would be to designate all
their servants as, and confer upon them the powers of, peace officers,
and no matter how negligent or wrongful might be the conduct of
such persons while acting within the scope of their employment, and
in discharging the duties which devolve upon the cities as common
carriers, those who might suffer from their failure to discharge the
obligations resting upon the cities as common carriers of passengers,
would be remediless. .

There is nothing, therefore, in the point made by appellants that
the employee who primarily committed the wrong was a policeman,
because he was, nevertheless, an employee and engaged in the dis-
charge of his duties. Under section 58, chapter 565 of the Laws of
1890 (General Railroad Law), conductors and brakemen on steam
railroads may be appointed policemen, and in practice often are,
which statutory provision has been long a part of the law of this
State. (Chap. 346, Laws 1863; chap. 223, Laws 1880.) In one
sense every citizen is a policeman, having power to arrest any per-
son who commits a crime in his presence, or any person who has
committed a felony, though not in his presence. (§ 183, Code
Crim. Proc.) We do not think that it could be seriously argued
that a railroad could escape liability for an unjustifiable arrest made
by a conductor-policeman while engaged in his duties as a conductor.
As well might the railroad say that he made the arrest as a citizen
(if he did not happen to be a policeman), and that, therefore, it was
not liable for his acts.

This disposes of the most serious question in the case.

We have been referred to some exceptions taken to rulings exclud-
ing questions directed towards showing why the arrest was made,
and upon what ground, and as to how the assault occurred, but this
subject having been fully gone into, and it being simply an exercise
of discretion of the trial judge in limiting such cross-examination,

we do not think that such a line of inquiry, because stopped by the trial judge, would justify a reversal of the judgment.

So with respect to questions calling for the conclusion of the witness Bishop requiring him to state by what authority he placed the plaintiff under arrest.   The form of such questions as calling for a conclusion was objectionable; but, apart from this, it will be seen that we have discussed the question upon the theory that it was established by a fair preponderance of evidence that Bishop was known and appointed as a bridge policeman; and, as will appear from the quotations already made, we have commented upon what his duties were, so that the defendants are in no way prejudiced by the exclusion of such questions, because we have, from the testimony, assumed the most favorable view that could be claimed by the appellants.

Other minor exceptions have been called to our attention, but we do not regard them as meritorious or requiring comment.

Upon the question of damages, though reduced by the trial judge, the amount is perhaps a trifle high, but not so excessive as to require us either to further reduce it or to set aside the verdict and grant a new trial upon this ground.

Upon an examination of the entire record, and in view of the disposition made by requiring a reduction of the original verdict by the trial judge, we think that the judgment as entered does substantial justice and should not be reversed.

Our conclusion, therefore, is that the judgment and order should be affirmed, with costs.

VAN BRUNT, P. J., and FOLLETT, J., concurred.

Judgment and order affirmed, with costs.